OPINION OF THE COURT
Joseph J. Dawson, J.
Defendant has been charged with one count of criminal pos *383 session of a weapon in the third degree, two counts of criminal possession of a weapon in the fourth degree, and one count of possession of ammunition. (See Penal Law § 265.02 [4]; § 265.01 [1]; Administrative Code of City of NY § 10-131 [i] [3].) Defendant has moved to suppress a loaded .25 caliber pistol and switchblade seized from him by the arresting officer, an oral statement that he made at the time of the arrest, and both written and oral statements that he made to a detective about 21/2 hours later. On May 2, 2007 and May 3, 2007, this court conducted a Mapp/Huntley/Dunaway hearing. For the reasons set forth below, defendant’s motion to suppress is denied in its entirety.
The People’s witnesses were Police Officer Angel Andujar and Detective Daniel Mullarkey. The court credits the testimony of both witnesses.[1] Defendant presented no evidence.
Findings of Fact
In early January 2006, Detective Mullarkey of the 44th Precinct was assigned to investigate a shooting that allegedly occurred on New Year’s Day inside 1269 Grand Concourse, Bronx, New York. (See minutes, May 3, 2007, at 4, 16-17.) On January 4, 2006, Officer Andujar and two other uniformed officers in the 44th Precinct were informed of “problems” in the area and were assigned to conduct patrols from a marked police van. Among other things, Andujar was told that there had been a shooting several days earlier in the building at 1269 Grand Concourse. Andujar was familiar with the premises and knew that it was both a “drug-prone location” and a “Clean Halls” building in which the police have been given the right to enter for the purpose of apprehending trespassers. (See minutes, May 2, 2007, at 6-7, 9.) According to Andujar, a “Clean Halls” building is one in which the police have the right to ask occupants for identification to ensure that they are either residents or invitees, and to arrest trespassers. (Id. at 9, 11-12.) There is a “Clean Halls” sign posted at the front of 1269 Grand Concourse. (Id. at 12-13.)
*384 At approximately 11:15 p.m., Andujar observed four or five men in the lobby of 1269 Grand Concourse. (Id. at 7-8.) The door to the lobby was “wide open,” and in front of this door stood a locked metal gate. (Id. at 7-10.) Andujar and his two partners entered the building through an unlocked side door and went to the roof. Each officer then patrolled down one of the three internal staircases of the building and converged in the lobby. (Id. at 9-10.) Upon arriving at the lobby, Andujar again saw the four or five men in the lobby, including the defendant, who was drinking from an open bottle of Heineken beer. There were five or six beers on the floor. (Id. at 10-11, 24-25.) Andujar approached the defendant and asked him for identification for two reasons. First, “he was drinking a beer in a public place.” Second, “because it was a ‘Clean Halls’ building,” Andujar “wanted to make sure that [the defendant] live[d] there.” (Id. at 11-12.)
In response to Andujar’s request, the defendant replied that he did not have identification on his person, but that “he could go to [his] house and get [it].” (Id. at 11-13.) Defendant stated that he lived in the building. (Id. at 36.) At that time, Andujar did not intend to arrest the defendant. (Id. at 26.) Instead, he wanted to issue a summons to the defendant for possessing an open container of an alcoholic beverage in a public place. (Id. at 28-29.)
Andujar asked the defendant to put the beer down and, at the same moment, saw the top of a knife, which was clipped to the inside of defendant’s right front pants pocket. (Id. at 12-14.) Andujar asked the defendant if he had anything sharp or anything which could harm the officer. Although the defendant initially denied having any such item, Andujar asked again, and defendant replied in the affirmative. (Id. at 13-14.) The defendant’s hand then moved towards the knife as if he were going to take it out of his pocket. Andujar said “no,” grabbed the defendant’s hand, and took the knife “away from him for my own safety.” (Id. at 14.) Andujar looked at the knife and realized that it was a switchblade. (Id. at 14-15.) Andujar tested the knife, satisfied himself that it was, in fact, a switchblade because it had a button and a spring-operated locking mechanism. The officer then determined that he would arrest the defendant for possession of the weapon. (Id. at 15-16.)
Andujar asked the defendant whether he had “anything else that might harm me.” (Id. at 16.) The defendant looked down and nodded. (Id. at 16.) Andujar then reached out and felt the *385 defendant’s left and right jacket pockets. In the right pocket, Andujar felt something hard, and removed a loaded .25 caliber pistol from the defendant’s jacket. (Id. at 16-17.) While the defendant was turning around to be handcuffed, he stated that he was carrying the gun because he had a problem with somebody from Marcy and Elliott Place. (Id. at 16.) Andujar had not asked the defendant any questions prior to this statement, and had not advised him of his Miranda rights. (Id. at 16-17.) The defendant did not have a permit or license to carry the pistol. (Id. at 18.)
Andujar turned the defendant over to Detective Mullarkey, who had been assigned to investigate the New Year’s Day shooting. (See minutes, May 3, 2007, at 4, 14.) Mullarkey learned the defendant’s name during his investigation of the shooting. (Id. at 4.) Mullarkey did not see the defendant being brought into the precinct. He also was unsure of the exact time when they actually met because he had been processing an unrelated arrest when the defendant was brought into the detective’s upstairs office. He also did not remember whether the defendant was brought into the office in handcuffs, but knew that he was uncuffed for the interview. (Id. at 4-5, 15-16.) In the interview room, Mullarkey initially told the defendant he was investigating the shooting and looking for information about it. (Id. at 5-6, 16.) Mullarkey usually gives interviewees “a little background” information because he wants to give them an “idea what it’s going to be about.” Although he did not recall his exact words to the defendant, the detective said something about the fact that some women had been beaten up at a party, that there was a shooting in his building, and that “I was going to give him an[ ] opportunity to tell me what he knew about it.” The defendant did not “make any utterance” suggesting that he had been involved. (Id. at 6, 17.) The detective made no promises, and the defendant did not ask for an attorney. (Id. at 5.)
At 1:30 a.m., the detective administered Miranda warnings to the defendant, reading each of the six warnings from a sheet, waiting for the defendant’s responses, and asking him to place his initials next to each one. (Id. at 6-9; see People’s exhibit 1.) The defendant signified that he understood that he had the right to remain silent, that anything he said could be used against him, that he had the right to consult with an attorney, that an attorney would be provided for him if he could not afford one, and that he had the right to remain silent until he had *386 a chance to consult with an attorney. (See People’s exhibit 1.) After being given those warnings, defendant expressed an intention to make a statement. (See id.)
At first, the defendant claimed that he was at work when the shooting occurred. (Id. at 16.) Mullarkey replied that he would need to verify the story, and asked for the name of someone who could support the alibi. (Id. at 16.) The detective also suggested that he might have to talk to the defendant’s wife. (Id. at 18-19.) The defendant eventually “gave it up” and told the detective what had happened on the night of the shooting. The detective heard the statement orally at first and then recorded it in his own handwriting, making a few corrections. The defendant signed the written statement. (See People’s exhibit 2.)
In the statement, the defendant told Mullarkey that he had a New Year’s Eve party in his building and that some of the women from his party had a dispute with the female guests from another party in the building. The defendant stated that he went outside to smoke a cigarette, and saw six or seven men from Marcy Place enter the building. According to the statement, those men began beating up the women. The defendant stated that he went into his apartment, retrieved a loaded .38 caliber gun, returned to the lobby to scare the men away, and fired six shots in their direction. The defendant later learnéd that someone had been hit. Defendant claimed that he discarded the .38 caliber gun, and that, on the night of his arrest, he had been carrying the .25 caliber pistol for his own protection because somebody had told him that the men were hiding in the lobby outside his door. (See People’s exhibit 2.)
Conclusions of Law
As to the Mapp/Dunaway portions of the hearing, the People had the burden, of going forward with credible evidence tending to show that the police officers acted lawfully, and defendant had the burden of proving by a preponderance of the evidence that the police officers acted illegally. (People v Berrios, 28 NY2d 361, 367-368 [1971].) As to the Huntley hearing, the People had the burden of proving beyond a reasonable doubt that defendant’s statements were voluntary. (See People v Huntley, 15 NY2d 72, 78 [1965].) The People have met their burden of going forward on the Mapp/Dunaway issue in this case, and have met their burden of proof on the Huntley issue. Defendant, on the other hand, has not met his burden of proof on the Mappl Dunaway issue.
*387 First, as to the Mapp/Dunaway issue, the court concludes that Officer Andujar had ample reason to believe that defendant had committed a violation of the Administrative Code of the City of New York by consuming beer in a “public place.” (See Administrative Code § 10-125 [b].) This being true, the officer had probable cause to make an arrest; he certainly had a right to ask the defendant for identification and, upon learning that he had none, to search him and transport him to the precinct for the purpose of confirming his identity and ensuring that there were no outstanding warrants for his arrest. (See, e.g., People v Hernandez, 27 AD3d 292 [1st Dept 2006], lv denied 6 NY3d 848 [2006]; see also Matter of Victor M., 35 AD3d 180 [1st Dept 2006] .)[2]
Defendant urges that the lobby of an apartment building is not a “public place,” and that, therefore, Officer Andujar had no legitimate justification to conclude that he had committed any offense. The law clearly treats the common areas of residential buildings, like lobbies, as public places for some purposes, but not for others. (Compare Penal Law § 221.10 [1]; § 240.00 [1]; § 245.11 with Penal Law § 140.00 [5]; § 140.10 [e], [f].) The hallways, stairwells and lobbies of apartment buildings are not regarded as “public” places for purposes of trespass or burglary statutes. (See, e.g., People v Padilla, 37 AD3d 357, 360-361 [1st Dept 2007]; People v Williams, 16 AD3d 151, 151-152 [1st Dept 2005], lv denied 5 NY3d 771 [2005]; People v Rodriguez, 159 AD2d 201, 202-203 [1st Dept 1990], lv denied 76 NY2d 742 [1990]; People v Torres, 162 AD2d 385, 386 [1st Dept 1990], lv denied 76 NY2d 897 [1990].) On the other hand, these areas are treated as “public places” for purposes of some crimes involving weapons or marihuana possession, and certain forms of disorderly or offensive behavior. (See, e.g., Penal Law § 240.00 [1]; § 245.11; Administrative Code § 10-134.1 [b] [3]; § 10-134.2 [a] [3]; § 10-136 [d] [3]; People v Powell, 54 NY2d 524, 531-532 [1981]; Matter of Calvin R., 291 AD2d 346 [1st Dept 2002].) The lobbies of apartment buildings also are generally regarded as “public” in nature for other purposes as well. (See, e.g., People v Bartley, 219 AD2d 566, 567 [1st Dept 1995], Iv denied 87 NY2d 898 [1995] [no legitimate expectation of privacy in lobby of apartment building]; People v Marrero, 173 AD2d 244, 245 *388 [1st Dept 1991], appeal dismissed 78 NY2d 969 [1991] [police entry into lobby was not unlawful because it was a public place].)
The question here, then, is whether the use of the phrase “public place” in the Administrative Code provision that proscribes the public consumption of alcoholic beverages was intended to encompass the lobbies of apartment buildings. (See Administrative Code § 10-125 [b].) The starting point in ascertaining legislative intent is the language of the provision itself. (See, e.g., Matter of Albano v Kirby, 36 NY2d 526, 529-530 [1975]; see also Anderson v Regan, 53 NY2d 356, 362 [1981].) True, as defendant observes, the Administrative Code provision in question is entitled “Consumption of Alcohol on Streets Prohibited,” and does not explicitly state that the lobby of an apartment building is a “public place.” (See Administrative Code § 10-125.) That, however, is not conclusive.
Far more persuasive is the sweeping definition of “public place” that is contained in the ordinance itself. A “public place” is defined as “[a] place to which the public or a substantial group of persons has access, including, but not limited to,” an assortment of locations like roads, sidewalks, parking lots, playgrounds and beaches. (Administrative Code § 10-125 [a] [2].) In other contexts, the statutory definition of a “public place” has been held to encompass the lobbies and common areas of apartment buildings. (See, e.g., Matter of Calvin R., 291 AD2d at 346.) Moreover, both the City Council and the New York State Legislature have, in assorted other provisions, specifically referred to hallways and lobbies of apartment buildings to illustrate what is meant by “[a] place to which the public or a substantial group of persons has access.” (See Penal Law § 240.00 [1]; Administrative Code § 10-134.1 [b] [3] [possession of box cutters]; § 10-134.2 [a] [3] [possession of laser pointers]; § 10-136 [d] [3] [aggressive solicitation].)
While the City Council did not see fit specifically to mention apartment lobbies when illustrating the kinds of public places that could be reached by section 10-125, it preceded that list with the words “including, but not limited to” — a broad and expansive statutory phrase (§ 10-126 [a] [2]). As the Court of Appeals held long ago, the use of the word “including” can be intended either “to bring into a definition something that would not be there unless specified,” or “to show the meaning of the defined word by listing some of the *389 things meant to be referred to, but not by such listing excluding others of the same kind.” (Red Hook Cold Stor. Co. v Department of Labor of State of N.Y., 295 NY 1, 7-8 [1945].) Where, as here, a legislative body uses the phrase “including, but not limited to,” it signals the latter intention; the items that follow generally are regarded as illustrations, not an exclusive list. (See, e.g., Matter of Farrell v Board of Zoning & Appeals of Inc. Vil. of Old Westbury, 77 AD2d 875, 877 [2d Dept 1980]; see also Matter of Christina F, 74 NY2d 532, 536 [1989]; cf. People v Foster, 73 NY2d 596, 606 n 4 [1989] [noting the significance, in the larceny statute, of the difference between the use of the word “includes” and the phrase “includes, but is not limited to”].)
Were the court to construe Administrative Code § 10-125 (b) to exclude the common areas of apartment buildings to which substantial groups of people have access, it would be required to ignore the City Council’s use of the words “but not limited to” in the text of the statute. Moreover, the court would be required to disregard the fact that, in employing the very same definition of “public place” in other areas of the Administrative Code, the Council explicitly mentioned the common areas of apartment buildings to illustrate what is meant by “[a] place to which the public or a substantial group of persons has access.” (See Administrative Code § 10-134.1 [b] [3]; § 10-134.2 [a] [3]; § 10-136 [d] [3].) Since the court cannot reasonably conclude that the City Council would use the same definition simultaneously to include and to exclude the common areas of apartment buildings in two different sections of the same part of the Administrative Code, I hold that the phrase “public place” in section 10-125 (b) can, and does, include the common areas of apartment buildings to which substantial groups of persons have access.[3]
Since the proof at the hearing demonstrated that Officer Andujar saw defendant commit an offense by drinking from an open container of beer in the lobby of the apartment building, the People met their burden of going forward with evidence tending to show that the arrest and subsequent seizure *390 of both the switchblade and the gun were supported by reasonable cause. The motion to suppress these items, therefore, must be denied. Similarly, to the extent that defendant has moved to suppress his oral statements to Andujar and Mullarkey and the written statement on Dunaway grounds on the theory that this evidence flowed from an unlawful arrest, the motion is denied.[4]
As to the Huntley portion of the hearing, the court first concludes that the People established beyond a reasonable doubt that the defendant’s oral statement made to Andujar — to the effect that he was carrying the gun because of a problem with people from Marcy and Elliott Place — was a spontaneous remark, not a product of custodial interrogation. Since that statement was spontaneous and not prompted by questioning, it is not subject to suppression on Huntley grounds. (See, e.g., People v Rodney, 85 NY2d 289, 292-293 [1995].) The motion to suppress it, therefore, is denied.[5]
*391 As to the oral and written statements made to Mullarkey, the People met their burden of proving beyond a reasonable doubt that the detective administered proper Miranda warnings and did not engage in improper coercion before eliciting the statements. Since the People have established that the statements were voluntary, the motion to suppress them is denied.

. The People introduced two exhibits — the written statement signed by defendant and the Miranda sheet containing the warnings read to defendant and his acknowledgment of each. The People’s posthearing submission contains two exhibits. But, instead of being copies of the actual hearing exhibits, they are copies of photographs that were never introduced into evidence. Needless to say, it is inappropriate for the court to consider any item not properly introduced into evidence. Thus, the court has disregarded the items that were attached, obviously in error, to the People’s submission.

. The testimony elicited at the hearing demonstrated clearly that defendant was seen and confronted in the lobby of the building. (Compare Matter of Victor M., 35 AD3d at 181 n 2 [majority opinion], with 35 AD3d at 183 n [McGuire, J., dissenting].)

. The defendant’s reliance upon People v Bobo (191 Misc 2d 118 [Nassau Dist Ct 2002]) seems misplaced. The Bobo decision does not involve the common areas of apartment buildings. In addition, it is unclear whether, or to what extent, the definition of “public place” contained in the North Hemp-stead town ordinance at issue in Bobo resembled the New York City Administrative Code provisions involved here.

. Even if the court had reached a contrary conclusion regarding the meaning of Administrative Code § 10-125 (b) here, it would have upheld the arrest and seizure on an alternative ground. Specifically, regardless of any open container violation, the officer would have had a right to request information, including identification, from the defendant after seeing him and his cohorts after 11:00 P.M. drinking beer in the lobby of a “Clean Halls” building that not only was located in a drug-prone area, but also was the site of a shooting only a few days earlier. (See generally People v Hollman, 79 NY2d 181, 189-191 [1992].) When defendant responded that he had no identification, but lived in the building, the officer was not required simply to assume that he was being told the truth. (See, e.g., Matter of Victor M., 35 AD3d at 181 [majority op]; id. at 183-184 [dissenting op].) The officer’s response — to tell the defendant to put down the beer — was entirely appropriate as an incident to a further inquiry. Since, at that very moment, the officer saw the top of a knife clipped to defendant’s clothing, Andujar had every right to ask whether defendant possessed something that could hurt the officer. (See, e.g., People v Benjamin, 51 NY2d 267, 271 [1980].) In the face of defendant’s clearly-false denial that he possessed anything sharp, the officer’s response — simply to ask again — was entirely reasonable. When defendant not only replied that he had something sharp, but also reached for it, Andujar was entirely justified in grabbing defendant’s hands and the potential weapon. Upon realizing that the knife resembled a switchblade, the officer had ample cause to seize it, arrest defendant and search him incident to the arrest. (See, e.g., People v Argentina, 150 AD2d 703, 703-704 [2d Dept 1989], lv denied 74 NY2d 736 [1989].) The subsequent pat down and seizure of the firearm, therefore, was also justified.

. There also is no basis for suppression of defendant’s affirmative response to the question whether he had anything sharp in his possession. The officer was entitled to ask such a question for his own safety without administering Miranda warnings. (See, e.g., People v Burgos, 255 AD2d 199 [1st Dept 1998], lv denied 93 NY2d 851 [1999].)